Case of the Day, which is Upside Foods v. The Commissioner, 24-13640. I've got Mr. Sherman here for the appellant, Mr. Norby, Mr. Muehlhoff here for the appellees. Mr. Sherman, whenever you're ready. Thank you, Your Honors, and may it please the Court. I'm Paul Sherman for the appellant, Upside Foods. I'm joined by Sir Angin Sen, my co-counsel from the Institute for Justice. Your Honors, this is a straightforward case of express federal preemption. Before we get to the merits, can we talk about mootness? Certainly, Your Honor. At least for my purposes, can you explain to me why your amendment of the complaint before you filed the appeal doesn't moot the appeal? Your Honor, the reason why the case is not moot can be found in Johnson v. 3M Company. Is Johnson a case in which the amendment predated the appeal? I do not know the answer to that. The answer's no. And if the answer's no, why shouldn't that matter? I mean, it just strikes me. Maybe this is just like the most simplistic way of thinking about this imaginable, but the way I have typically thought about jurisdiction working is that only one court can have the thing at a time. So it's different. If there's an appeal, and then, like, so now we have the thing, and there's this little skirmish going down below, and perhaps there's an amendment. Now we've got some case law about whether or not that skirmish ought to moot out our appeal. But when the amendment predates the appeal, it's like we never got the thing. It's like you appealed a non-thing. I don't think that's correct, Your Honor, because we appealed under 1292, and 1292 grants this court the jurisdiction to hear interlocutory appeals of orders granting or denying preliminary injunctions. Wasn't the P.I. in service of the initial complaint? Right? I mean, like, it doesn't exist in the ether, the request for the P.I. Like, you file a complaint, and on the basis of that complaint, you seek a P.I., right? Your Honor, I really think that this is maybe more formalistic than the federal rules require. This is not a limitation that appears in the text of section 1292. Section 1292 does have limitations that appear in it. And what this court has held about mootness on appeal is that a case becomes moot on appeal only when it is impossible for the court to grant effectual relief to the appellant. Now here, I don't think anyone would argue that it would be impossible for the court to grant effectual relief. The case is going on below. And even the government, in its motion to dismiss below, at pages 6-7, docket 54 of the state attorney's motion to dismiss, said that the amendments to the complaint did not substantively change our arguments. I agree. I agree it's pretty formalistic, and maybe I'm sort of captive to my own formalism, but it just seems that the P.I. doesn't sort of, like, exist, as I said, I guess, in the ether. It's like sort of adjacent to the complaint, and if the complaint that forms the basis of the P.I. request is itself amended and sort of evanesces, it itself becomes a nullity. I don't really know how the P.I. continues to exist independently. Your Honor, I frankly just don't think that that is a limitation that appears in the text of section 1292. And I think the text of 1292 sets out the scope of this court's jurisdiction. So let me ask you this. Are there any cases, the Fifth Circuit Cemetery's case, which I know you probably think is wrong, but are there any cases other than that in which the posture is like this one, where there is an amendment, then an appeal, and a court says, we're good to go? The appellate court says, it's okay, we're good to go. So I don't know the precise timing of the amendment and the appeal, but the Second Circuit in State Farm Mutual Auto Insurance, which is 120F459, in that court, there was an amendment after a denial of a preliminary injunction. The court said, we agree with the reasoning of this court in Johnson v. 3M, and conclude that whether a revised pleading renders an appeal moot turns on whether that pleading materially changes the substantive basis for that appeal. So, see, I think, and I promise, I'm going to shut up because others have questions and you want to move on. But it just seems to me that perhaps it matters. It sounds like, I don't know the timing of the appeal there either, maybe one of my colleagues does. But it seems to me that the timing might matter, that if a revised pleading moots out a presently pending appeal, then that's sort of like a different body of law, whereas the one we have here, it's the revised pleading, does it sort of affect an appeal that has not yet been taken? Right? I mean, so let me ask you this. Assume there had been no appeal, and you amend your complaint. What do you think the operative pleading is, the initial complaint or the amended complaint? I think the amended complaint would be the operative. So at that point, then you file an appeal from the initial complaint. That's what happened here. Right? There was an amendment. So now we have a new operative complaint. The old one is a nullity. And yet you appeal from a PI that is adjacent to that one. Your Honor, I think still again you're appealing from the denial of the preliminary injunction and that is what the scope of 1292 is. You might be right. Can I build on that? Because I think mootness is a threshold issue that we need to deal with. Certainly, Your Honor. While that's an issue with regard to the amendment, a larger issue is because Judge Walker kept the case or kept the thing, he did some additional rulings, one of which was to dismiss this  The case is now in the lower court has been dismissed for two reasons. One, because he found that even though your client had a right to bring a private action typically based on actual injury, Article III injury, it was precluded or preempted from bringing any action because of the language in the Poultry Protection Inspection Act to begin with. And that statute has this provision, quote, all proceedings for the enforcement or restraint violations of this chapter shall be by and in the name of the United States. Judge Walker said, yes, as I did in my original order, I found that your client had standing in the usual sense. But now he said because of that provision, your client is, the government has preempted any right to bring any action to enforce the PPIA. We have a lot of acronyms in these cases. So just to disentangle . . . Isn't that what occurred below? Well, so just . . . And then he said, even assuming you had the right to bring the action, there wasn't this preemption by the words in the statute itself, he then went ahead and ruled on the merits and dismissed the case. So just to disentangle a couple of things with the dismissal below, the dismissal below was only a partial dismissal. It did not dismiss the dormant commerce claims, which are live and moving forward. But this was not, this before us was not brought on the dormant cases. It was brought specifically on 1883, wasn't it? The then existing count. That is gone. Well, but Your Honor, a case only becomes moot on appeal if it is impossible to grant effectual relief. Under the doctrine of merger, a complete dismissal of all the claims by all of the parties will moot a case. But a partial dismissal is not. But you said you don't have the right to bring this because the government has the exclusive right to bring cases with regard to violations of the Act or to enforce the  Yes, Your Honor. That's what you're doing here. But that does not go to mootness. That goes to cause of action, which is not jurisdictional. And that argument is incorrect. One way to address the mootness issue is, do district courts control what we can do? No, Your Honor. District courts do not. So if a district court dismisses a claim, does that mean that we cannot grant relief on that claim as an appellate court that reviews what district courts do? No, it does not, Your Honor. So you can continue pursuing this claim in the district court because it's not over in the district court. The district court could change its mind, right? Certainly the district court could change its mind. And I think in order from this court— Yeah, one way it could change its mind is we could tell it that it was wrong. Yeah. If this court holds that we have a likelihood of success on the merits, I think it's very likely Judge Walker would change his mind. And if we told the district court you have to grant the preliminary injunction, the district court would grant the preliminary injunction? Certainly would, Your Honor. That would be if he decided only on the issue of likelihood of success. That doesn't deal with the issue of whether you can bring the case in the first place. Right. And so to get to your point about Section 467C, Judge Hawk, that provision does not apply to lawsuits like this seeking to hold that a state law is preempted under federal law. I think it's noteworthy that in the entire history of the PPIA, no lawsuit has ever been brought by the United States. You're not suing a chicken processing plant for violating the PPIA, right? No, we are not, Your Honor. You're suing the state of Florida and saying, state of Florida, you're not allowed to enforce your state law against a state supremacy claim? That is exactly right, Your Honor. And you've said over and over again, you're moving those kinds of things. Yes, Your Honor. And the text of the statute says that only the United States can enforce the statute, but you're not seeking to enforce the statute? Correct, Your Honor. Because Florida doesn't have any obligations under the statute anyway. We are seeking to enforce our rights to be subject to the federal regulatory scheme exclusively. That's textbook preemption of the type that this court hears all the time. And I think you can look at other provisions. That hasn't been briefed for us, has it? That issue has not been briefed for us, has it? I'm sorry? The issue of whether what you're bringing below, in fact, is there or is not a violation, an attempt to enforce a violation or interpret the statute. Your Honor, all of this was briefed in the briefs before this court. The government made all of these arguments in its appellate briefing because appellate briefing was concluded before the district court granted its motion to dismiss. So the government argued we didn't have a cause of action under 467C. It argued that we didn't have a cause of action. It argued that all proceedings for the enforcement of restraint, violation of this chapter shall be by and in the name of the United States. That was briefed here? Yes, that was fully briefed, Your Honor. And the point that I'm making is that violations of the PPIA in the relevant sense are violations of the substantive provisions of the PPIA. And in fact, you can look at its section 461 of the PPIA, 21 U.S.C. 461. And it talks about any person who violates the provisions of, and then it says sections 458, 59, 60, 63, 66. These are all the regulations that are imposed on poultry producers. But there was, I think, never any intent on Congress to foreclose this well-established equitable remedy. And once we get across that threshold, this court concludes that these are poultry products, which Judge Walker directly held below. Could you address that? How are these poultry products, given that there was never a bird involved in this? There was a bird, Your Honor. So the definition of poultry product is broad. It contains any poultry carcass or any part of a poultry carcass or any product made from any part of a poultry carcass. In this case, Upside extracted cells from a poultry carcass. It then replicated those cells. Those cells were made from part of a poultry carcass. Yeah, but they weren't, but the product, I mean, the way I understand, I mean, one way to understand, I guess, that statute is we're asking whether the food product was made from a poultry product process. Poultry. We're not asking whether somewhere in the chain there was a chicken, right? So I guess you're seeming, you seem to suggest if there's somewhere in the chain there was a chicken, then the resulting food product is a poultry product. But isn't, doesn't the chicken have to be like in the poultry product itself? No, Your Honor, and this is the argument the government takes, and I think it mistakes made from for made, I'm sorry, it mistakes made of for made from. So the PPIA says it has to be made from, not made of. In the same way, bourbon whiskey is made from corn, but no one would say that bourbon whiskey is made of corn, that it contains corn. So in the same- Is that right? Maybe I'm not a hard enough drinker, but is that right? I mean, like, does bourbon not contain any corn, any corn residue, something? I don't think, so, well, under federal law, bourbon whiskey must be made from a mash that contains 51% corn. I think in the bottle itself, I don't think any ordinary speaker of English would say that that bottle contains corn. They would say it contains a product that was made from corn. The chicken cells that are an upsized product were made from chicken cells extracted from a poultry carcass. Isn't this more like, I mean, all these hypotheticals become a little silly, but isn't this more like saying a chicken is made from corn, right? So the chicken eats corn, and the chicken then turns that into chicken meat, and so you'd say chicken made from corn. Well, I think there's certainly a tighter connection between chicken cells extracted from a carcass and the duplication of those cells to make the product that my client ultimately wants to sell to consumers in Florida. You know, at the- Yeah, there is a tighter connection, but isn't it the same kind of, I mean, isn't it the same kind of idea? You're, yeah, you started with poultry product, but then you just came up with something else, and here it happens to be like, you know, molecularly the same thing. Well, so, Your Honor, I would say that's not a limitation that appears in the text of the PPIA, and there are limitations in the text of the PPIA for certain types of poultry products, but only those that the Secretary of Health and Human Services has expressly said are not regulated under the PPIA. That has not happened here. To the contrary, the USDA's position is that these are poultry products and should be regulated as such, and I see that I'm into my- I have a question, because I kind of hijacked the movement. Oh, you want me to go? Let's talk about the ingredients provision. It says that a state cannot add on or have different than the provisions of the requirements of the statute, correct? So- What does the statute say? Yes, the state cannot impose any requirements- What does the court of statute do to add on or different from? It differs from the federal requirements in that under the PPIA, cultivated poultry cells are allowed to be used- They're allowed, but they're not required. They don't have to be- It's something that's acceptable. That's correct. And no more. That's correct, Your Honor. It's regulated like any kind of other chicken. That's correct, Your Honor. And isn't this chicken, your chicken, the cultivated chicken, essentially the same, made up of the same ingredients, chicken cells? The only difference being that one is in a chicken, grows in a chicken, the other grows in a cultivator, I think. Yes. Yeah. So these cells- So the ingredients are exactly the same, chicken cells. So, but the government is saying that these particular chicken cells cannot be included. That is certainly a requirement that differs from the federal requirement because under the federal requirements, they are allowed to be included. The statute doesn't say anything about what has to be included. They're just saying if it's this type of chicken, we ban it. That's all it does. It doesn't reach into and say it has to be this way, it has to be that way. We're just saying we don't find this to be an acceptable version of chicken. I don't think the state has that power under the PPIA. It did under the horse meat case, the foie gras case. But what distinguishes those cases from this one is that in the foie gras case, for example, that dealt with animal husbandry practices while the chickens were alive and the USDA said, we don't have any jurisdiction over the treatment of chickens while they're alive. Everything that is happening here is occurring- We don't regulate what they can sell or can't sell, which is exactly what the state of Florida has done. I don't care what you do in Berkeley, California, how you make your chicken filet or whatever it is, but we don't want it here. And that's all they're saying. Well, you do whatever you want there in Berkeley, but we're not going to reach into your factory or whatever you call it, facility. Once it's made, we don't want it in the state of Florida. For whatever reason, whether it's to protect the chicken farmers, as you said, or whether it was because they think it's going to be the guinea pig, that kind of a product. But Florida hasn't banned the slaughter of chickens for human consumption. What it has banned is the sale of a product based on the way it's made within an official establishment regulated by the USDA. That is the core of what the PPIA is intended to regulate. You couldn't set up a- I mean, if you move away from the ingredients thing, it seems to me your better argument for preemption is under manufacturing. This regulates the way you create chicken, right? Yes. You couldn't create chicken this way in Florida, right? No, you can't create it this way in Florida, and Florida will not allow you to sell it if it's created this way anywhere else, which is the National Meat Association case. So it's basically Florida, by saying you can't sell this meat as long as it's manufactured this way, is telling you how you can manufacture meat because this is the Florida market. That's correct, Your Honor. Ultimately, for our likelihood of success, it doesn't really matter whether this law is conceived of as an ingredients requirement or a facilities requirement. If this court finds that either of those are satisfied, then I think it's indisputable we've shown a likelihood of success because the government, frankly, hasn't really tried to defend this on the merits of the PPIA preemption provisions. It's focused mostly on the mootness and cause of action. Yeah, well, I mean, but the district court, though, that was the basis of its ruling. The district court sort of assumed everything away and then said, look, I just want this preemption. Yeah, and that's because the district court treated this as a conflict preemption theory instead of an express preemption, where you have to look at the text. That's not what Judge Walker did. He never used the word conflict. He used exact words in the statute several times, and then he used kind of an inconsistency as a shorthand for that in addition to or different than. He used that time and time again, so he didn't treat it as a conflict. He treated it as based on the statutory language. Well, but I think his understanding was that the statutory language required that there be a conflict in the sense of some kind of inconsistency where you cannot. I don't see that in his order. That's your interpretation, but I do not see it in his order. Well, in any event, I think the First Circuit's recent decision in Northwestern Selecta, which we submitted as supplemental authority, I think that goes very clearly to the breadth of these preemption provisions and also that there does not need to be any kind of conflict. All that matters is that Upside is subject to a single set of regulations, the federal set of regulations. Florida tries to prohibit a product that the federal government says, yes, when it's made this way in an official establishment, you can sell it. That is expressly preempted. Okay. Very well. Let's hear from the government at Belize. And just so we understand, how are you guys proposing to split your time? Yes, sir. Our plan is for me to take the cause of action and mootness issues and for my colleague, Mr. Norby, to address preemption, both the interpretation and the actual merits question. Okay. Very well. Good morning, Your Honors. May it please the Court. Jason Muehlhoff for State Attorneys. I'd like to pick up on the Court's cause of action discussion, especially in light of the focus order. Also address any questions about the Declaratory Judgment Act or Georgia Latino. To start, Upside lacks a cause of action under the PPIA.  They definitely don't have an action under the PPIA, right? They're not suing you for your chicken processing in Florida.  Both sides agree on that. What they're saying is they're saying that you can't enforce Florida law against them. Why don't they have an action to say that? Well, for a couple of reasons, Your Honor. First, turning to 21 U.S.C. section 467, which Judge Huck has already mentioned. I'm sorry. They're not suing under the PPIA, right? Yes. You just referred me to the PPIA. Sure. They're not suing under that. Yes, Your Honor. So why do they not have a cause of action? So the test under both equity and section 1983 looks at has Congress displaced any cause of action through the statutory language. And so here you turn to the PPIA. And so what we have in section 467C. Let me ask you this. If Florida prosecutes them for violating Florida law and selling this lab-grown chicken, can they raise the preemption argument and say you're not allowed to prosecute us because of the PPIA? Yes. Then why can they not just bring the same thing against you and say we want a declaration of our rights and we cannot be prosecuted for violating Florida law? So, Your Honor, there's the distinction between raising it in a defense in a proceeding versus trying to bring it as a pre-enforcement or a preemption challenge. Is that a distinction you're asking us to make up right now? Or is that based on something? No, Your Honor. We think that's clear from the Supreme Court's case in Armstrong, which again looks at cause of action raised in situations like this. And what it ultimately says is that Congress has the right to explicitly or implicitly limit any cause of action, including one brought in equity, which would be like the situation we were just talking about. And so then, again, you go to the text of the PPIA and what we think is you have a remarkably clear displacement because it says, again, all proceedings for the enforcement or to restrain violations of the PPIA shall be brought by— Right, but Florida's not being alleged to violate the PPIA, right? Florida's not a regulated entity under the PPIA. And they're not enforcing the PPIA against Florida. They're not saying you're violating the PPIA, therefore you have to close your chicken processing plant. So, Your Honor, what I think Upside has to say is that Florida, in enacting its law, is violating the PPIA because to have— They're not interested in that. They just want you to not prosecute them for selling their lab-grown chicken. The same way that you just said that they could bring this if you were prosecuting them, they're just bringing it as a declaratory judgment action saying you can't prosecute us. So, Your Honor, again, I think what they have to say is that what Florida is doing with its ban on self-cultivated chicken is imposing a requirement either on the manufacturing or on an ingredient. So, the only way to win on a supremacy clause claim is to say that Florida's law violates in some way the PPIA. So, I still think it's inescapable that at some point in its argument— That's the thing. The state doesn't violate—the state can pass a law that is inconsistent with federal law all day long. And probably, like, if you look at Florida's statutes, they're like half of them are in certain respects. And Florida's not being, like, put in jail for that, right? They're not being sued for that. They're not being fined for that. They haven't violated anything. But when it comes to it, they can't enforce some of those laws against some people some of the time. Certainly are, but the reason that they can't do it in some instances is because a court finds that they are in violation or clashing with some federal statute. So, again, we think under the supremacy, it always has to come back to are the requirements under Florida law inconsistent or a direct conflict with the PPIA? But again, stepping back, Your Honor, we think, one, that Congress has been clear here of displacing any equitable cause of action, which is the context here, or Section 1983, which is the same step in terms of looking at congressional displacement. We also think it's clear that here no personable right has been granted to upside, and therefore that also is an independent reason why they can't bring— So all of this turns on the idea that they're trying to somehow enforce or restrain a violation of the PPIA, right? That's your no cause of action argument. It's based on that. Well, again, Your Honor, so for a cause of action under equity or Section 1983, we are looking at the fairest reading of the text here, the PPIA, and asking has Congress granted them— No, they're not trying to—I mean, I guess they're not bringing a cause of action for a violation of the PPIA, right? They're not. or a declaratory judgment action to get—it's basically an ex parte young claim saying, like, you can't prosecute us for violating the Florida law. We've said you can bring that kind of cause of action, right? Yes. So maybe one last passage, and then I'd like to turn to the Declaratory Judgment Act, and Judge Littino, I don't mean to speak past you, Judge— Well, I'm just trying to figure out—I mean, your whole argument really does depend on the interpretation of this, all proceedings for the enforcement or to restrain violation of this chapter shall be by and in the name of the United States, right? That's what—if we don't interpret that the way you want us to, they do have a cause of action. Not necessarily because we think that the other thing they need to prove is that the PPIA grants them a certain right. And again, that's a high bar here, and we don't think— Okay, okay. Where do you get that from, given that we've said—I mean, the case that we cited to you George Littino says that we have little difficulty in holding that plaintiffs have an implied right of action to assert a preemption claim seeking injunctive relief, right? We didn't ask whether the federal law that was doing the preempting gave them some kind of cause of action. We just said, look, you have a cause of action to say you can't prosecute me under this state law because of a federal law that conflicts with it. Certainly. To your first question, Judge Brasher, I will point you to the Supreme Court case, Gonzaga. There it says, or in the context of Section 1983, the statute must grant rights and it must do so in clear and unambiguous terms. We think that's a high bar. If you're trying to enforce a statute, right? Yes. But we've said in the preemption context, you have the right to bring one of these injunctive claims. Right. So what do you say about Georgia, I guess? What do you say where we said specifically you can literally bring exactly this case? So to Georgia Latino, Your Honor, two answers. The first is a broader point. The cause of action holding in Georgia Latino has been directly abrogated by Armstrong. So Georgia Latino starts by saying, we find at the beginning of the cause of action section and then footnote eight at the conclusion, they root the cause of action for a pre-enforcement challenge in that context in the supremacy clause. Armstrong, I believe about a decade later, makes abundantly clear that the supremacy clause is neither a source of rights for the individual, nor is it a cause of action. Those two are fundamentally incompatible. So we think that the holding there from Georgia Latino has simply been aggregated. And now you need to approach it under the Armstrong framework, which is the framework, Your Honor, that I've been trying to discuss about. But Armstrong is whether the Medicaid statutes give you the right to. So once again, Armstrong is about trying to enforce a statutory right. Right? Yes. I answer. And I'm going to have questions. You know, just just forget about this. No, no, no, no, no. No, no. He's not going to convince me. So just. Well, maybe one very quick pass, Your Honor. Armstrong talks about the ex parte, the cause of action. And I think you are describing and it says that those are found in equity. And then the very next section says in equity, the question that we look at is, has Congress displaced that? That's like the first two sentences of that new section that discusses equity. So what I think the Supreme Court and Justice Scalia are doing there is saying that tradition of ex parte young has to be run through the new framework of equity. And the question of equity is, has Congress displaced that cause of action in this section? And finally, that third section where they address the dissent says even longstanding traditions like the ex parte young style cause of action or pre enforcement challenge is subject to the same equitable principles announced in Armstrong. So we really think Armstrong addresses even if you think it's separate from, say, a direct violation of a statute. We think Armstrong still addresses the equitable cause of action, including like the ex parte young cause of action. OK, so can you just hum a few bars on mootness? And I think it may be that Judge Huck and I have slightly different mootness questions. We're hung up potentially on different things. Tell me why I guess I'm right to be hung up on this only one court has the thing at a time. You know, because I think his response is not without some foundation. He says, look, look at 28 U.S.C. 1292A. I'm within the terms. What's your problem? So to that point, your honor, you certainly have noticed. And we we also focus on the fact that once there's an amended complaint, the original complaint is rendered a legal nullity. We think there's many or there are multiple 11th Circuit cases to say that, you know, might even say, yeah, granted. But I've got this motion kind of hanging out there. And the denial of that thing under 1292A gives me a right to appeal that thing. Like that's the relevant thing, not the complaint to which I was describing it as adjacent. But maybe that's not the right way of thinking about it. So, your honor, the P.I. goes to the original complaint. And so it is the preemption claims under the original complaint. And so by amending the claim and you notice the distinction between amending the claim first before the notice of appeal versus flipping it, which is probably a more muddled set of affairs. Here, I think it's clear it doesn't get out the gate. The P.I., the whole original complaint, as the P.I. that was attached to it is rendered a legal nullity. And it is a formalist finding, your honor. But many questions around jurisdiction are formalist. And we also think it provides a remarkably clear rule for parties. The question for mootness is whether it's impossible for us to grant relief on appeal. Explain to me how it's impossible for us to grant relief on appeal. Certainly, your honor. And so right now, the only question before you is the preliminary injunction on the preemption claim from the original complaint. The judge has since, and this is Judge Hux. And so just to be clear, the amended complaint doesn't really change anything much with that claim. So it does raise two new preemption challenges. It makes clear that there's two causes in equity and two causes in Section 1983. And they do add some facts. But certainly, we would agree that the core preemption, they are raising a preemption challenge. So this isn't a situation, for example, where, like, I bring a claim and I say, you know, the stoplight was red. And then I, like, file an amended complaint. And I'm like, you know what? Actually, the stoplight was yellow. And the facts, like, are radically different. It's the same. It's basically the same record. It is a similar core of facts, yes, your honor. So why can't, like, how is it impossible for us to grant them the injunction that they're seeking? Because a preliminary injunction, all it does is preserve the status of the parties and the status quo until the district court can reach a final ruling on the merits, which the district court has done here. No, no, it's not. No, it's not. It's not entered into final judgment at all. It dismissed these claims. But that doesn't matter. Well, certainly, your honor, the point being that a ruling from the preliminary injunction from this court, even if it was to reverse, doesn't, has no obligation on the district court to change its ruling at the MTD. Wouldn't it, I mean, I'll tell you, here's the thing. It may not have a, if we tell the district court, you have to grant this preliminary injunction, is the district court going to grant the preliminary injunction? Certainly, your honor. Yes. If, even if not in this case, let's say just another 11th Circuit case was raising the same issue, and that 11th Circuit case came out and said, you know what? Claims like this should go forward. Would the district court change its dismissal order and let those claims go forward? It would have to, right? So, it's not entirely clear to me that it would, your honor, because, again, I think the district court would be like, I don't care what the 11th Circuit says about claims that are exactly like this. I'm just going to stand with my dismissal order and wait to be reversed. No, your honor. No, certainly not, your honor. There's an important distinction between likelihood of success on the merits and the merits, the Supreme Court's University of Texas case makes that distinction clear. But because there are other factors that are still in play, so here Judge Walker only ruled on likelihood of success of the merits, there's other real questions about whether a preliminary injunction was proper, the delay between the law being enacted. But we were told we'd have to do the preliminary injunction. I mean, I'm saying, wouldn't he undismiss, right? If we said, yes, there's a substantial likelihood of success on the merits here, or just in some other case, I mean, the Supreme Court could say it in a case from the 9th Circuit. I mean, who knows? He's going to undismiss those claims, right? So, again, your honor, I don't think there's anything formally that would require him to. And it comes awfully close to being a very strong advisory opinion on the MTD, which is not before this court saying. I mean, I guess my point is it's totally up to Judge Walker as to what he wants to do with that dismissal. Because there's no final judgment, he can undismiss them, he can keep it dismissed, he can change his mind whenever he wants to. What does that have to do with whether we can grant the preliminary injunction? Maybe two quick last points on that, your honor. First, again, the fact that this is such a tangled procedural web of what would have to happen and would Judge Walker on his own initiative have to take a couple additional steps shows that I think it is a very awkward fit. And that's where the two mootness claims come together. Not only has Judge Walker ruled on the issue, but also there's now a different complaint. And so trying to piece together how this court could provide effective relief on now a new amended complaint in which Judge Walker has already ruled on the relevant merits, I think just shows that this is multiple steps removed from any natural effect. If we were to say that the dismissal of claims, not the entry of a final judgment, which would give you the right to appeal afterwards, if we were to say that the dismissal of claims precludes any appeal of a preliminary injunction, wouldn't we be telling district courts that they should just dismiss claims so that we can never review a preliminary injunction denial? That seems to be your argument is that if the district court denies the preliminary injunction, then there's a right to appeal. But a district court can just moot that by just dismissing the claims as well as denying the preliminary injunction. Yes, Your Honor. But a preliminary injunction is a drastic remedy. It's never afforded as right. What it seeks to preserve is that the parties will have a chance at a full briefing and a decision on the merits. That's happened here. And, of course, after the dormant commerce— They'll have a chance to appeal the denial of one. Yes, Your Honor. And they will have a chance to appeal once the dormant commerce clause issue, the last remaining one below, is dismissed. They'll have a chance for— Then they're appealing the final injunction, not the preliminary injunction, right? Certainly are. Your Honor, our position is that we're okay saying you had an initial shot with the preliminary injunction. You then had a second shot with the MTD. You have lost on both, and you'll have a final shot at the end once it's properly— And there's no way for the appellate court to review the denial of the preliminary injunction? If the court has—if the district court has later— If the district court dismisses, there's no way for the appellate court to review the denial of the preliminary injunction? There are certainly procedures. They could move to pending jurisdiction. They could move for an interlocutory appeal on the MTD. They could dismiss their dormant commerce claim right now and seek to move immediately to final injunctive relief. But, again, Your Honor, it's not afforded as of right, and they've had, we think, two bites at the apple with one coming. So we think that is a sufficient state of affairs on this mootness issue. Okay, very well. Thank you for your endurance. Thank you, Your Honor. Let's hear from Mr. Nordby on the merits, I understand, right? Yes, Your Honor. Thank you very much. Daniel Nordby for Agriculture Commissioner Wilton. Counsel, the state attorney has addressed this jurisdictional issue. I'd like to focus my time on the merits of the preemption claims here. Now, the EPIA government birds and carcasses, but even assuming that Helen's product here is poultry, the district court properly denied injunctive relief because Florida's law does not violate the ingredients or facilities clauses of the EPIA's preemption. Now, as a threshold question, it's important to address whether upsized cultivated cells molded into the shape of a chicken cutlet is a poultry product at all under the EPIA. We should begin with the statutory text, Section 453F of the EPIA, and find that the poultry product is any poultry carcass, a part thereof, or any product which is wholly or in part from any poultry carcass, or a part thereof. Now, none of the cells in these chicken cutlets that the attorney proposed to sell here were ever in the carcass of a chicken. Is that simply, just so I understand the science, is that simply because the initial cell divided and became its own two, and then its own four, and then its own 16, or whatever? Is that the reason? So, my understanding from what's been alleged in their complaint and their preliminary judgment here is that at some point in the past, a cell was extracted from a chicken. That cell was then treated in some way that's called immortalizing it, and then that immortalized cell was duplicated again and again and again, grown in a vat with nutrients, and those nutrients chemically are used to create all of these cells that may genetically be chicken cells, but in our view are not definitionally poultry under the EPIA. Why are they not made from? I mean, to be a little gross about it, I guess, but aren't I made from my dad's sperm and my mom's egg, even though I don't have them coursing through my veins currently? Well, I think that at some point, and this is maybe Judge Brasher's question in the earlier colloquy, at some point the extension into the distant past is what something is made from. Is the chicken made from corn? But, I mean, I guess just, I mean, I'm not trying to be sort of flippant about this, but answer my question. Am I made from my mom's egg and my dad's sperm? In an ordinary understanding of those terms. I don't think in an ordinary understanding of those terms in an act such as this one, the poultry product inspection act of 1957 was concerned with birds that were slaughtered and treated and making sure that those would be wholesome and non-adulterated. I don't think in the context of this act it would be natural to say that a product that can compose of cells that were never in the carcass of a slaughtered bird are nonetheless made from that bird. Right. It's concerned with stuff like chicken salad, right? It's like a product, it's a food product that's made from poultry parts. That's right. And in the implementing regulations, you reverse all the different parts of a chicken's carcass. There's wings, there's thighs, there's different, there's barbecued chicken. Things that can be made from a chicken's carcass. That's simply not what we have here. We have something that's genetically chicken, genetically chicken, but it's not made from a poultry part. What do we do with the fact that the USDA has decided that this is made from chicken and is a poultry part? I mean, we don't have to defer to that, but it just seems if we were to agree with you on this issue, we would basically be saying, I think, that these chicken things are not regulated under this, right? So I can understand the regulatory impulse to say somebody needs to be looking at what's going on here, these products are going to be sold. That doesn't change the definition of commerce in that. And the formal agreement and the directive that the economists want to do, which they have just claimed any reliance on in this report, don't by themselves have any rules of law. They don't report to confer any rights on anyone. What they've announced is a policy statement on how FDA and USDA propose to treat this new emerging industry and where they view their regulatory overlap in those two separate federal agencies. I think that's a far cry from what Congress has enacted and what USDA has done in their actual formal notes and comments. None of which references cultivated chicken or this product here. In fact, we're happy that something like this has been conceived of. If we were to get to the second merits issue, and the one I think the district court ruled on, if I remember right, what do you say about the Harris case from the Supreme Court? It's the non-ambulatory pig case, where it seems like there are parts of that Harris case that say, trying to ban sort of the importation of a meat product based on the way that that was manufactured is preemptive. What we can say about the National Meat Association here is that whole California was directed at regulating the manner in which And the Supreme Court distinguished the horse meat case, for example, the Covell case, the Rockefeller case, which said, were cases about the ban of a particular product and instead of taking it on sale as a particular type of meat, did not preempt it by the FMIA. But isn't the only way here to tell the sort of the regular chicken meat from the new kind of chicken meat is by figuring out how it was created? I'm not sure that that's true. But that's not the Florida law. The Florida law does not regulate the premises or facilities that the appellant here uses. It doesn't, for example, take a different Florida statute that specifies the manner in which self-cultivated chicken is to be produced if it is to be sold in Florida. I think that's the Harris case. That's not the Florida statute. Well, let me give you this hypothetical. I mean, let's say California says we're not going to allow any chicken unless it's cage-free, right? So the only chicken that you can sell in California is cage-free chicken. Isn't that preempted by the PPIA? I don't think that it would be. In fact, the Canars case from the 9th Circuit actually used the cage-free chicken analysis under the ingredients law, but that's a method of production. So cage-free chicken or horse-fed goose liver, those are means, those are techniques for producing a product. That's not an ingredient for a regulation on the facility. Okay. So a regulation on the facilities in my cage-free chicken example would have to be something like we're not going to allow chicken to be sold in California unless the chickens are in cages that are 8 feet by 8 feet, something like that? I mean, what's the difference? I mean, so here's what the Supreme Court said in Harris, which I just want you, this is, I think, the worst language for you, which is why I want you to respond to this language specifically. If the sales ban were to avoid the preemption clause, then any state could impose any regulation on slaughterhouses just by framing it as a ban on the sale of meat produced in whatever the way the state disapproved. That would make a mockery of the preemption provision. How is that not what's happening here? Because Florida is not regulating what happens at their facility. Florida is saying whatever happens at their facilities, that type of product produced in that way cannot be sold in Florida. It's the type of chicken that's produced in the same way that the horses in cages say that type of meat can't be sold in those cages. And the board in Harris specifically said it was not going to be that way. But I guess you, like, if they moved to Florida and tried to set up shop in Florida, they could not produce this in Florida, right, because of this law? Okay, so then how is that, like, how isn't that just a hypothetical to be like, well, if it's a pure sales ban, then it just affects the sale of a product and it doesn't matter if the production's irrelevant, like the horse meat, you know. Whereas here, they can't move to Florida and produce this. So it's got to be more than a sales ban if it tells them they can't even do it in Florida. Two premises that I'll get to. First, it would have to be poultry farms, so I'm assuming that. Yeah, right. And secondly, for the purposes of this preliminary injunction, it's not to get any desire. No, I know, but I guess this is a matter of hypothetical. Like, one way, it just seems like the Supreme Court is trying to draw a fine line here between, like, saying you can't just say it's a sales ban. One way to find out whether the sales ban is like an okay sales ban or a bad sales ban would be to hypothetically ask, like, if it's a sales ban, then I can do it. I can make the stuff. I just can't sell it. But your law says you can't make it either. It does. It says it can't be produced or sold in Florida. I think the statute, though, when it's compared to the statute that is used in the Harris case, it is more directly targeted at this product and the products being produced sold in Florida rather than the need to regulate the fees and facilities that are being purchased by the company. Okay, very well. Thank you so much. Mr. Sherman, you've got two minutes remaining. Just a couple of quick points, Your Honors. First, on the issue of cause of action under equity, my friend on the other side suggested you have to find some hook within the federal statute. That seems to come from the Tenth Circuit's decision in Safe Streets v. Hickenlooper. But the Tenth Circuit actually just this week, in a case called Green Room v. Wyoming, which is 2025 West Law 2999673, has a lengthy footnote where it explains that they are, in fact, the only circuit that has adopted that approach. Every other circuit, including this circuit, most recently in the Florida Immigration Coalition, unpublished opinion, which you were on the panel for that, Judge Newsom, has held that these causes of action in equity are only displaced in situations where there is an expressly provided method of enforcing the substantive rule and the relevant federal law right is judicially unadministrable. That's not the case here. My friend on the other side also, getting to the mootness point about the amended complaint, talked about the core facts of the PI being in the original complaint. The core facts of the PI are in the declarations that were submitted with the PI. Nothing in the original complaint or the amended complaint conflicts with those, and I think this court has jurisdiction to consider whether, under those facts which were presented to the court below, plaintiff is entitled to a preliminary injunction. The question about cage-free, just to be clear, our understanding of the PPIA is that it applies only to official establishments. So a farm where chickens are being raised is not an official establishment, but a place where poultry is produced would be. And just one last quick point. We believe that the scope of the definition of poultry product is broad enough to capture this product. It may not have been on everyone in Congress's mind, but I think it's an interesting historical fact that Winston Churchill, in 1931, in an essay titled 50 Years Hence, said, we shall escape the absurdity of growing a whole chicken in order to eat the breast or wing by growing these parts separately under a suitable medium. It's not unimaginable that Congress wanted to capture all poultry products, including things that had not been fully envisioned by scientists at the time. I think this definition does that. And so therefore, I ask you to reverse the court pull-up. Okay, very well. Thank you all. The case is submitted. And we'll move to the fourth and final case of the day, 24 to...